Filed 10/24/14  P. v. Lopez-Castillo CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN RAMON LOPEZ-CASTILLO, et al.,<br><br>    Defendants and Appellants. | A137788<br><br>(Sonoma County<br>Super. Ct.  No. SCR608983) |

Defendants Juan Ramon Lopez-Castillo and Jose Carraballo-Mejias appeal separately from their convictions for the murder of Jose de Jesus.

Counsel for Juan Ramon Lopez-Castillo has filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).  Upon independent review of the record, we conclude no arguable issues are presented for appellate review.  Therefore, we affirm the judgment against him.

Jose Carraballo-Mejias argues the court violated his constitutional rights by admitting certain evidence and excluding or restricting other evidence, and by denying his motion for mistrial based on prosecutorial misconduct.  He does not establish any error.  Therefore, we affirm the judgment against him as well.

### BACKGROUND

On October 6, 2011, sheriff's deputies found the lifeless body of Jose Manuel de Jesus in the open trunk of a blue Dodge Intrepid in the parking lot of Carniceria Contreras, a butcher shop in Santa Rosa, California.  De Jesus had been shot once in the

1

head.  The subsequent investigation led the authorities to piece together a story of Mejias, Juan Ramon Lopez-Castillo (Ramon), Fernando Lopez-Castillo (Fernando),[1] and Alberto Lopez-Barraza (Barraza) robbing de Jesus of a large amount of marijuana, during which Fernando shot de Jesus.

In June 2012, the Sonoma County District Attorney filed an information in which the four men were charged with counts arising from the robbery and killing of de Jesus. They were charged in separate counts with murdering de Jesus (Pen. Code, § 187, subd. (a)),[2] a serious and violent felony (§§ 1192.7, subd. (c), 667.5, subd. (c)), and it was alleged that Fernando fired the murder weapon; conspiring together to commit felony robbery of marijuana from de Jesus (§§ 182, subd. (a)(1), 211); and violating section 211 by unlawfully, and by means force and fear, taking personal property from de Jesus, a serious and violent felony (§§ 1192.7, subd. (c), 667.5, subd. (c)).  Mejias was alleged to have suffered numerous prior convictions and served prior prison terms as described in section 667.5, including one prior strike conviction and one prior serious felony conviction.

We summarize the proceedings and evidence presented below that are relevant to our resolution of the issues raised in these two appeals.

### Disposition of the Charges Against Ramon

In November 2012, prior to trial, Ramon pled no contest to murder in the first degree with the understanding that he would be sentenced to 25 years to life with the possibility of parole.  The People agreed to dismiss the remaining charges against Ramon and two unrelated cases.  Agreements so stating were signed and filed in open court, and the court questioned Ramon to ensure his knowing, voluntary agreement to them.  The court found that he understood the nature of the charges against him, understood and voluntarily and intelligently waived his constitutional rights as set out in the agreements, had made his plea freely and voluntarily, understood the consequences of his plea, and

---

[1]  Ramon and Fernando are brothers.  We refer to each by his first name, as designated by the parties, for the sake of clarity and mean no respect by doing so.

[2]  All statutory references herein are to the Penal Code unless otherwise stated.

that there was a factual basis for his plea. Ramon agreed to waive his right to appeal or petition for a writ of habeas corpus "as long as his sentence is consistent with the [plea] agreement."

As we will discuss, an amended information was filed and a trial of the charges against Mejias and Barraza was completed. In January 2013, on the day of sentencing, Ramon asked to withdraw his plea. His counsel stated that Ramon wished to do so because the agreement he signed was not the agreement he wanted to sign, which was something his counsel had been aware of previously. His counsel also stated that he did not know if there was a basis for this withdrawal, and that there was "a considerable record made as to the plea that [Ramon] entered, which was exhaustive." The People opposed the request and stated that Ramon had the right of appeal if he wished to challenge some aspect of the proceedings.

The court denied Ramon's request "[b]ecause there was an exhaustive record made at the time of the plea. The two codefendants that have been tried were convicted of first degree murder. They are exposed to 25 to life without the possibility of parole. You pled to an agreement with the D.A. to have the possibility of parole. And my understanding of the facts is that that is a very fair and reasonable deal, given what was presented at trial of this matter, which, granted, did not include you; but the facts which came out regarding your involvement would suggest that this is a good deal for you."

The court sentenced Ramon to 25 years to life in prison with the possibility of parole. It credited him with 461 days for actual days in custody, but no custody credits pursuant to section 2933.2. It ordered him to pay a restitution fine of $2,000 pursuant to section 1202.4 and imposed on him and the codefendants a joint and several liability for a $5,000 restitution fee for burial expenses. Ramon subsequently filed a timely notice of appeal.

### Disposition of the Charges Against Mejias

In November 2012, the three remaining defendants were charged in an amended information with the crimes previously alleged against them, as well as the murder of de

3

Jesus in the commission of the crime of robbery (§ 190.2, subd. (a)(17)),[3] thereby making Mejias vulnerable to a first degree murder conviction pursuant to the "felony-murder rule," whether as a coconspirator or aider and abettor in the robbery of de Jesus."[4]

A trial was conducted regarding the charges against Mejias and Barraza, with separate juries considering the charges against each of them. Mejias did not dispute that he, Ramon, Fernando, and Barraza went to the Carniceria Contreras parking lot in a black Cadillac driven by Ramon, de Jesus arrived there sometime later in a Dodge Intrepid with boxes of marijuana, Ramon took the boxes from de Jesus, Fernando confronted de Jesus with a gun and pushed him into the open trunk of the Intrepid (as did Ramon) and shot him in the head, and Mejias, Ramon, Fernando, and Barraza then left together in the Cadillac. Mejias's defense was that he was there to engage in a drug cash transaction only and did not know, or approve, of any plan to rob or harm de Jesus.

De Jesus's friend, Elias Alfaro, testified at trial that de Jesus, wanting money for his family in Mexico, decided to sell marijuana for the first time. Alfaro arranged to meet with Ramon, who he knew from the Carniceria Contreras. De Jesus and Alfaro met with Ramon and Mejias on October 5, 2011, and showed them a sample of the marijuana de Jesus wanted to sell. De Jesus indicated how much he was planning to sell. Mejias spoke only in English and Ramon translated things said in Spanish for him at his request, Mejias claiming he did not know what was said. Mejias asked if de Jesus could get more marijuana. De Jesus said he would find out and the meeting ended. Later that day, de

_____

[3] Section 190.2, subdivision (a)(17)(A) provides that "[t]he penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: . . . (17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit . . . (A) Robbery in violation of Section 211 or 212.5."

[4] The first amended information again charged Ramon with violating section 211 by unlawfully, and by means force and fear taking personal property from de Jesus. This appears to have been a drafting error because of the negotiated disposition of the charges against him that we have discussed. Nothing in the record indicates the district attorney pursued this count against Ramon.

4

Jesus arranged with Ramon to meet again, at Carniceria Contreras at Ramon's request because, de Jesus told Alfaro, of the location of Mejias's hotel. Mejias lived in Santa Rosa, was not staying at a hotel, and spoke Spanish.

The next day, October 6, 2011, Mejias, Ramon, Fernando, and Barraza went to the Carniceria Contreras. Customers of the shop testified that shortly before the shooting, they saw two men in a black Cadillac parked away from the other cars in the parking lot, as if the men were waiting for someone; the driver was talking angrily on the phone and was seen both in and out of the car. Testimony indicated that there could have been people in the back seat of the Cadillac. After the customers went inside the shop, they heard a loud noise outside, like car hit a car or a muffled bang according to two witnesses. An arriving customer saw a blue Dodge Intrepid parked next to a black Cadillac, and the Cadillac speed out of the parking lot with at least two or three people inside it. A customer who investigated reported that a man had been shot and was bleeding in the parking lot, and 911 was called.

The police investigation, which began with a cell phone recovered at the scene belonging to de Jesus, eventually led to the recovery of cell phones for both Ramon and Fernando Lopez-Castillo and what was later determined to likely be the murder weapon; all were found in the same general vicinity of a nearby road. Phone records showed multiple communications in the days and weeks before the shooting among various of the men later charged. These included calls to and from the phone of Mejias's girlfriend, Jamie Barboza. She testified that she let him use her phone because he did not have one of his own.

Anna Velasquez testified that she knew the men charged. At the time of the shooting, she lived with Fernando, who was her ex-boyfriend, and Ramon in Petaluma. Fernando and Ramon's cousin, Barraza, lived in Hayward. Velasquez smoked methamphetamine with Fernando and Barraza at her home early in the morning of October 5, 2011, when Ramon came into the house and said something like, " 'We have to go fix everything for tomorrow.' " He left with Barraza to meet with someone, came back a few hours later, then left again in a black Cadillac and did not return until the next

5

morning, October 6. Velasquez, Fernando, and Barraza again smoked methamphetamine that morning. Later, Velasquez saw Fernando, Ramon, and Barraza loading guns in the apartment. She heard Ramon say they had to go pick up "Cuba," who she identified as Mejias. The three left in the black Cadillac and were gone all day.

Velasquez said she called Fernando most of the day but could not reach him until 8:00 or 9:00 p.m., when she called Barraza, who told her something had gone wrong. Fernando took the phone and told Velasquez to gather their "stuff," stay at the home, and not answer the door. When he returned, they put their stuff in a van; Velasquez had not seen the van or its driver before and noticed Barraza and Mejias inside it. They dropped off Mejias in Santa Rosa and drove to Hayward. Velasquez, Fernando, Ramon, and Barraza were arrested in San Mateo a few days later.

Two other pieces of evidence were introduced at trial that are pertinent to this appeal. First, recordings of certain telephone conversations between Mejias and Barboza when Mejias was in jail after the incident were played for the jury. The parties do not indicate the recordings, or transcripts of them, are in the record before us. However, the prosecutor read portions while cross-examining Mejias, from which we now quote.

On October 29, 2011, Barboza said to Mejias, " 'You don't have any money. You don't have any car. You don't smoke weed, you don't own a gun. You don't have any reason for robbing anybody. What would you do with it anyway? You don't know anybody to sell it to. The only thing I could think of is that you're just, you're just so into getting into trouble that you just don't know better.' " Mejias responded, " 'The letter, what I wrote you in the letter, it was the truth. It has been eating at me. Is from eight, from eight months ago when I got out of jail, there was a group of us that went around doing what I told you in the letter.' " Barboza testified that she shredded the letters that Mejias sent her from prison.

Mejias also said during this October 29 conversation, " 'Every time Jesus and them call me it was a set-up, it was something that was already set up, and it was just, I was just the middle, I was just going there and making it . . . .' " When Barboza angrily

6

asked him why, he said " 'I was trying to do, is get a big score so I can buy you a fucking house. That's what I was trying to tell you.' "

In this same phone call, Barboza asked Mejias if he was going to be blamed. Mejias said, " 'No, no, no, they know the whole, they know the whole situation. They know who the shooter is, and they know how many pounds were gonna be taking, and Ramon opened his big mouth and gave them all this information. Which it was good, 'cause he put himself in his own spot.' " He continued, " 'And wasn't supposed to go down like that. There wasn't even supposed to be any gun. The guy was supposed to come over by itself, and then I was supposed to stay in the car, and them three was supposed to take it from him out of force.' " He also said, " 'You know, they were going to beat him up and take it from him. And then that shit came down, and then these two pulled a fucking gun, and they were fighting with a gun in the hand, and the guy kept pulling on the gun, and the gun went off, and they shot him in the head[.]' " He told Barboza, " 'You know, I wasn't going to go, but I just kept thinking about buying you the pretty little things that I keep thinking about.' "

At one point in their conversations, Barboza called Mejias a robber. Mejias did not respond.

Second, a document written by Mejias after his arrest intended for his lawyer was seized from his jail cell. It contained references to drug activity in Sonoma County and to the other defendants charged with de Jesus's murder, and was introduced into evidence at trial. We will discuss it shortly.

Mejias testified on his own behalf. He acknowledged that he had several previous convictions and prison terms. He admitted he lied to police in his initial conversations with them, falsely claiming that he was not at the scene of the incident, and wrote letters in which he also falsely stated he was not there.

Mejias testified that he was an "errand boy" for a drug dealer named Jesus Sanchez Bastidas. In August 2011, he met Ramon, and the next month talked to him about a car he was selling. He did drug deals for money with Bastidas and Ramon, and

7

there were never any guns involved. He met Fernando in September 2011 and Barraza at the time of the shooting.

At one point, Bastidas told Mejias that he had investors who wanted to buy 300 to 400 pounds of marijuana. On October 5, 2011, Mejias received a call from Ramon, who said he wanted Mejias to look at some marijuana that might be bought for the investors. Ramon and Mejias met that day with Alfaro and de Jesus. Mejias examined a sample of marijuana in de Jesus's car. He spoke English to Ramon because Ramon was learning the language. Ramon asked how much marijuana de Jesus could sell and Mejias got out of the car while the others continued to talk.

Mejias said that the next day, October 6, 2011, he received a call from Ramon, who told him they were going to look at some more marijuana from the day before. Ramon picked him up around noon. Fernando and Barraza were in the car's back seat. Mejias, sitting in the front passenger seat, did not see, or talk about, any guns; in fact, he did not like them.

Ramon became agitated when he could not reach the seller and decided to drive to Carniceria Contreras, where he used to work to say hello to the people there. When they arrived there, Ramon told Fernando and Barraza to go inside the shop and say hello to the owners. Mejias told Ramon to take him home because nothing was happening. Ramon agreed and, at Mejias's request, stopped at a store, where Mejias bought some beers. Ramon then told Mejias he had talked to de Jesus and could not take Mejias home, and they went back to Carniceria Contreras. As they drove into the parking lot again, Ramon became upset that he again could not reach the seller and said he was going to beat him up. Mejias argued with him and told him he was not going to do that and that it was not what "Jesus wanted to happen," an apparent reference to Bastidas. Ramon called over Fernando and Barraza and told them in Spanish to get the "toys" or "guns." Fernando got something out of the back seat of the car, but Mejias did not see any guns. Fernando and Barraza went behind the carniceria. Mejias asked Ramon " 'What was that for?' " and Ramon replied, " 'The guy hasn't showed up, and I don't know where his head is';

8

something like that." Mejias remained in the car with the money, which was next to him on the floor.

About five minutes later after Mejias argued with Ramon, about three or four minutes after Fernando and Barraza went behind the carniceria, de Jesus arrived. Ramon told Mejias to stay in the car and Ramon got out and greeted de Jesus, who then took two boxes out of the rear seat of his car and placed them on the ground. De Jesus opened his car trunk while Ramon loaded one box into the back of the Cadillac. Fernando then walked over "kind of fast" to de Jesus from behind the shop, argued with de Jesus, and pointed a gun at him, which de Jesus tried to slap away. Mejias could not hear the argument, but saw pushing and grabbing. Fernando and Ramon each pushed de Jesus into his car trunk. Mejias heard a gunshot, Ramon say, " 'Let's go, let's go. Vamonos,' " and Fernando say, " 'Oh shit, I shot him.' " As Mejias started to get out of the Cadillac, Ramon told him to get back in and the four drove away.

Mejias testified that he was stunned. He never intended to participate in a robbery and never got out of the car. Fernando told him, "Don't worry about it. You didn't do nothing." As they drove away, he heard Fernando say something about the guns and something being thrown out the window. Mejias broke Ramon's cell phone in half and threw it out the window after Ramon told him to get rid of it.

Ramon drove to Hayward, where he abandoned Mejias and Fernando at a WalMart while they were shopping inside. Mejias and Fernando hitchhiked back to Santa Rosa.

Mejias was asked about the statements made in the recorded telephone conversations that he had from jail with Barboza. He testified that his references to activities, including as described in a letter to her, were about drug cash transactions, not robberies. He did not respond to Barboza's characterization of him as a "robber" because he did not want to upset her.

### Verdict and Sentencing

The jury found Mejias guilty as charged, and found true the special allegations before it. The court found the prior prison allegations were true as well. Mejias was

sentenced to life in prison without parole for the murder of de Jesus in the commission of a robbery, and six additional years based on the special allegations. Upper term sentences for the other counts were stayed pursuant to section 654.

Mejias filed a timely notice of appeal.

## DISCUSSION

## JUAN RAMON LOPEZ-CASTILLO

Ramon's appellate counsel raises no issues and asks this court for an independent review of the record as required by *Wende*, *supra*, 25 Cal.3d 436. In accordance with *Wende* and *Anders v. California* (1967) 386 U.S. 738, Ramon was informed of his right to file a supplemental brief, which he has not done. As demonstrated above, we made an independent review of the record and conclude no arguable issues are presented for appellate review. Ramon was fully advised of his rights and the terms of the plea agreement before signing it, and there is no indication that he received ineffective assistance of counsel. His sentence conforms to the terms of the plea agreement and is authorized by law. Our independent review having revealed no arguable issues that require further briefing, the judgment is affirmed.

## JOSE CARRABALLO-MEJIAS

### I. *The Admission Into Evidence of Mejias's Writing to His Lawyer*

Mejias first argues his convictions should be reversed because the court committed prejudicial error when it allowed into evidence an attorney-client privileged communication between him and his counsel— the document Mejias wrote for, but never delivered to, his lawyer—in violation of Mejias's constitutional rights to due process and effective counsel. We reject Mejias's appellate claim because any purported error was not prejudicial.

### A. *The Proceedings Below*

Mejias's writing was a four-page document, in which he stated information about drug activity in Sonoma County, including some information about the other men charged with de Jesus's murder. The parties agree that Mejias wanted his lawyer to give the information to the prosecutor in order to obtain a negotiated disposition of the charges

10

against him. The document was seized by corrections staff during a search of his jail cell before it was delivered to Mejias's lawyer.

Before trial, Mejias's counsel moved that this document be suppressed as an attorney-client communication. The People argued it was not privileged because it was seized before its delivery to Mejias's counsel and the information it contained was not intended to remain confidential, since Mejias intended that his counsel pass the information on to the prosecutor.

The court denied Mejias's motion. Based on its analysis of state and federal case law and the Evidence Code, the court ruled that the document, although intended for his legal counsel, was not a confidential communication because Mejias intended the information to be transmitted to the District Attorney during plea negotiations. A redacted version of the document was admitted into evidence with the stipulation that it was written by Mejias and obtained by a lawful court order.

The trial court read from the document to the jury. Most of what the court read discussed information about drug dealing in Sonoma County and certain individuals engaged in it, including "Jesu Sanchez Batistas," an apparent reference to Bastidas. At the end of the document, Mejias wrote that around September " '29th or 30th, Ramon and Fernando and Alberto got to Jesu house about 3:30 and had 30 pounds of weed. I was there when they gave it to,' and then 'him, Jesu,' is in parentheses, 'to sell. Plus they kept two guns. I seen it. I was there.' " At the end of the document, Mejias wrote, " 'To my lawyer.' "

**B.** *Analysis*

Mejias argues that the trial court committed prejudicial error by admitting the document into evidence because it was an attorney-client privileged communication. He argues the trial court applied case law too broadly, attempts to distinguish the cases cited by the trial court and the People, and contends that a communication drafted by an individual client for transmission to his attorney does not lose its attorney-client privilege because of the possibility that some of the information contained in the communication might be disclosed to third parties at some point in the future. He further contends that

11

the intent to disclose under his circumstances is not a waiver of a privilege prior to the disclosure taking place, and argues it would be untenable to adopt such a rule.

The People essentially argue that the trial court's analysis was correct. The People assert that, "[f]or the attorney-client privilege to apply, the document must be communicated to the attorney and it must be intended to remain confidential. They further assert that any error was harmless.

We focus our analysis on whether, even assuming for the sake of argument that there was error and given the other evidence admitted in the case, the admission of the document was prejudicial to defendant's case. Mejias, relying on *Chapman v. California* (1967) 386 U.S. 18, 24 and *People v. Tamborino* (1989) 215 Cal.App.3d 575, 585, argues that we must follow the federal standard of review for prejudice here, that being whether the letter's admission was harmless beyond a reasonable doubt. The People, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 and *People v. Canfield* (1974) 12 Cal.3d 699, 707-708, contend that we must follow the state standard of review for prejudice, that being whether there is a reasonable probability Mejias would have received a more favorable result but for the admission of the letter. We conclude that there was no prejudice under either standard, given that Mejias was convicted of murder committed in the course of a robbery, pursuant to the felony-murder rule.

We reach this conclusion based on the compelling evidence presented at trial that Mejias knowingly participated in the premeditated robbery of de Jesus, which led to de Jesus's murder. Much of this evidence can be found in Mejias's own statements to his girlfriend, Barboza, in their recorded telephone conversations. In response to her telling him that he had no reason to rob anyone, he told her that he had gotten caught in the middle of things that were already "set up", and that he was trying to get a "big score" in order to buy Barboza a house. These statements strongly suggest Mejias was engaging in a robbery; the term "set up" makes little sense otherwise. Nonetheless, it could be argued these statements, standing alone, contain a little ambiguity as to whether Mejias was talking about drug cash transactions, as he claimed, or robberies.

12

However, Mejias did not stop there in his statements to Barboza. Referring to the shooting, he told her that there "wasn't even supposed to be any gun. The guy was supposed to come over by itself, and then I was supposed to stay in the car, and them three was supposed to take it from him out of force." This statement about what he and others were "supposed to" do in order to take "it" from de Jesus "out of force" only makes sense if Mejias had agreed beforehand to play a specific role in a planned robbery. Mejias's trial testimony did nothing to dispute the import of this particular statement, which eliminated any ambiguity about his references to his knowing participation in robbery.[5]

Mejias argues it is not clear whether he was acknowledging in these statements that he had knowledge beforehand that a theft by force was going to occur, "or whether he was simply reporting to [Barboza] what actually happened from his vantage point *after* it occurred." We disagree. Mejias did not state what actually happened. He stated what was "supposed to" happen, and indicated he was working with the others in a coordinated robbery plan.

Mejias's statements to Barboza (as well as his lack of them, such as when he did not respond to her characterization of him as a "robber") were not the only compelling evidence of his guilt. Circumstantial evidence also points to his knowing participation in a deception of de Jesus that is consistent with a robbery plan. On the morning of October 5, 2011, Ramon said in Velasquez's presence prior to first meeting with de Jesus that "[w]e have to go fix everything for tomorrow." This suggests that first meeting was a pretext for the robbery planned for the next day. In any event, Mejias participated in the deception of that meeting by playing the part of the English-speaking money man: he spoke only in English and pretended not to understand Spanish (participating in the charade of Ramon translating what was said in Spanish into English for him). Most

---

[5] Mejias also said nothing to Barboza about any role he was "supposed to" play in the supposed exchange of money for drugs.

importantly, according to Alfaro he asked if de Jesus could obtain even more marijuana, an important step in the events that led to the next day's robbery and murder.

Mejias had no plausible explanation for his deception at this first meeting with de Jesus. His contention that Ramon acted as a translator for him because Ramon was working on his English is ridiculous. It demonstrates only that Mejias was willing to lie when it suited his purposes, as he did when he first spoke to police about his whereabouts at the time of the incident.

Additional evidence can be found in Mejias's conduct just prior to, during, and after the robbery and murder. That Mejias did not notice any guns prior to or at that time strains credulity. By his own account, he heard enough to understand his companions were armed. He testified that Ramon instructed Fernando to get "toys" or "guns" out of the back seat, which Fernando did, when de Jesus first arrived at the Carniceria Contreras. Moreover, Mejias's suspicions that something untoward was going to occur should have been further heightened when he heard Ramon in effect tell Fernando and Barraza to hide behind the shop as de Jesus approached. Yet Mejias did nothing but stay put, and even assisted Ramon in disposing of his phone later.

Indeed, Mejias's own testimony only raises more questions. If, as he testified, he agreed to participate in a nonviolent cash transaction only, why did he think Fernando and Barraza were there with guns? If he argued with Ramon beforehand not to beat up de Jesus, why did Mejias not immediately get out of the car when he heard about guns, whether to argue again with Ramon or leave? After hearing that de Jesus was shot, why did he do nothing to help him? Why did he stay in the car and leave the scene with the others? Why did he help Ramon dispose of his cell phone from the car? Why did he travel to Hayward and, as Velasquez indicated, return to Santa Rosa with Ramon later that same day?

Mejias did not explain these actions, other than to contend he was disgusted by the shooting and was abandoned by Ramon at a Hayward Walmart. Nonetheless, he argues prejudice from the last part of the document. There, Mejias stated that in late September, he was aware that Ramon, Fernando, and Barraza had two guns with them. Mejias

14

argues this was prejudicial to his defense that he was unaware that there would be any violence committed against de Jesus, or of any violence or guns in the other transactions in which he had participated. He argues the prejudice was increased because the judge read the letter to the jury, and the prosecutor both cross-examined Mejias on his prior knowledge of these guns and emphasized Mejias's knowledge in closing argument. According to Mejias, this evidence struck a "live nerve" in his case (see *People v. Vargas* (1973) 9 Cal.3d 470, 481), dramatically increasing the likelihood of prejudice here.

Mejias's actions—even by his own account—are damning evidence that he knew about and agreed to participate in robbing de Jesus by force of as large a supply of marijuana as he and Ramon could persuade de Jesus to bring to the Carniceria Contreras, under the guise that Mejias would purchase all of it. Whatever his knowledge, or lack thereof, that guns would be used in doing so was of no significance in light of this evidence because there was ample evidence to support his conviction of murder while committing a robbery under the felony-murder rule. " 'The felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state.' [Citation.] 'Under the felony-murder doctrine, when the defendant or an accomplice kills someone during the commission, or attempted commission, of an inherently dangerous felony, the defendant is liable for either first or second degree murder, depending on the felony committed. . . . Felony-murder liability does not require an intent to kill, or even implied malice, but merely an intent to commit the underlying felony. [Citation.]' [Citations.] 'The felony-murder doctrine, whose ostensible purpose is to deter those engaged in felonies from killing negligently or accidentally, operates to posit the existence of that crucial mental state—and thereby to render irrelevant evidence of actual malice or the lack thereof—when the killer is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it.' [Citations.]" (*People v. Bryant* (2013) 56 Cal.4th 959, 965.)

In light of the evidence we have discussed, we conclude the jury's knowledge that Mejias had previously seen his coconspirators with guns was inconsequential to its

15

verdict that he was guilty of felony murder, whether evaluated under the federal or state standard for determining prejudice.

## II. *Mejias's Testimony Regarding His Conversations With Barboza*

Next, Mejias argues that the trial court committed prejudicial error when it excluded and restricted evidence, in the form of his own testimony, about his relationship with Barboza while he was in custody and the context of their arguing that would have "mitigated" the impact of his statements to Barboza in the recorded telephone conversations. We disagree.

## A. *The Proceedings Below*

At trial, Mejias's counsel examined Mejias about Barboza's calling him a "robber" in one of their conversations. This led to an objection by the prosecutor that the court sustained:

"Q. During the course of those phone calls, she called, she essentially called you a robber, is that correct?

"A. She called me many things.

"Q. How has your relationship been with Jamie Barboza while you've been in custody?

"[The Prosecutor]: Objection, relevance.

"The Court: Sustained.

"[Defense Counsel]: Your Honor, it goes to explaining the next line of questioning that's coming up.

"The Court: Anything further?

"[The Prosecutor]: Same objection.

"The Court: I'm going to sustain."

Shortly thereafter, Mejias testified that he was arguing with Barboza when she called him a "robber." The following then occurred:

"Q. Do you recall what the context of that argument was at the time that [Barboza] called you a robber?

"A. [Barboza] told me that—

16

"[The Prosecutor]: Objection, hearsay.

"The Court: Well, sustained.

"[Defense Counsel]: Well, not asking for the truth of the matter. It's for Mr. Mejias's idea of what the argument was about.

"[The Prosecutor]: What's the relevance?

"The Court: What is the relevance of that?

"[Defense Counsel]: Your Honor, can we approach?

"The Court: We can. Do you waive reporting?

"[Defense Counsel]: Yes.

"(Sidebar, not reported.)

"Q. Mr. Mejias, what had you and Jamie been arguing about?

"[The Prosecutor]: Same objection.

"The Court: Overruled.

"[A.] My past, and my drugs used, and stuff like that.

"Q. So do you recall—and the evidence was played here in court, a recording where [Barboza] called you a robber?

"A. Yes.

"Q. Why did you not respond to that statement?

"A. Because if I respond, she'd just get more upset; and I wasn't trying to, I wasn't trying to, you know, deny things that, you know, about my past, and stuff like that, because she knows me. But I just didn't want to argue with her; because the more I talk to her, the more upset she got. So I just let her, you know, let the steam out, you know.

"Q. Do you recall, when she called you a robber, do you recall how you responded?

"A. Kind of hurt.

"Q. Do you recall if you talked about events that happened in the past?

"A. Yes, we did.

17

"Q. And what events in the past were you referring to when you responded to her statement about events?

"[The Prosecutor]: Objection. Vague.

"The Court: Overruled.

"[A.] My drug problems . . . ."

## B. *Analysis*

Mejias argues that the trial court's rulings violated his state and federal constitutional rights to present evidence in his defense, of confrontation, and to testify in his defense in two ways. First, it precluded his counsel from "attempting to put the ostensibly incriminating statements and silences of the telephone calls [with Barboza] into the context of the larger relationship" between Mejias and Barboza. Second, the court restricted his counsel to asking Mejias "about his reactions to specific statements in the telephone calls, rather than the overall tenor of the relationship." He does not establish either claim, whether we review the trial court's evidentiary rulings for an abuse of discretion, as we generally do (see *People v. Griffin* (2004) 33 Cal.4th 536, 577), or under a de novo review standard.

Regarding Mejias's "preclusion" argument, the trial court sustained the prosecutor's objection on relevance grounds to the following question: "How has your relationship been with Jamie Barboza while you've been in custody?" Mejias does not establish the court erred.[6] The relevance of the question was at best obscure and his counsel argued only that it would explain his upcoming line of questioning. On appeal Mejias suggests it was important to explain that he had become accustomed to acquiescing to Barboza's angry statements to him, but this also is not apparent from the

---

[6] Mejias's trial counsel argued the question explained the line of questioning he intended to pursue. He did not argue, as Mejias does on appeal, that his constitutional rights were implicated by the court's failure to allow Mejias to answer the question. Therefore, he arguably has forfeited his appellate claim. However, the People do not raise forfeiture. Therefore, we address the merits of Mejias's "preclusion" argument.

18

record below.  Under these circumstances, we fail to see any error by the trial court in sustaining the prosecutor's relevance objection.

Mejias again does not establish error in his "exclusion" argument.  Although his counsel held a sidebar, presumably to explain the relevance of his question about the "context" of Mejias's argument with Barboza when she called him a robber, there is no record of that sidebar.  Thus, we know neither the argument made by counsel nor what restrictions, if any, the trial court placed on his counsel's questioning.  We reject defendant's argument on this ground alone.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [" 'A judgment or order of the lower court is *presumed correct.*  All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' "].)  Even considering it on its merits, the record indicates that the trial court did *not* exclude the sought-after testimony.  Rather, immediately after the sidebar was completed, it allowed Mejias's defense counsel to explore this context by asking Mejias what the couple was arguing about, overruling an objection by the prosecutor in doing so.

Even assuming there was error—which there was not—there was no prejudice.  Mejias argues that the prosecutor's emphasis of Barboza's characterization of him as a "robber" in cross-examination and in closing argument, including her characterization of his failure to respond, or tepid responses, to her statements as "adoptive admissions," demonstrates the prejudice caused by the court's exclusion and restriction of the related evidence.  We disagree.  Mejias's explanation for why he did not respond to Barboza's characterization of him as a robber suggested his tendency to acquiesce to her in the face of her anger, and his counsel's questions to him after the sidebar similarly suggested the context of their argument.  His defense counsel added to this characterization in closing argument when he argued that, given that Barboza was upset after Mejias's arrest, it was reasonable that "when a couple that's been together for a long time argues, someone says something, and you just let it go, because that's not the point of the argument[.]"  He further contended it was reasonable to conclude Mejias did not tell Jamie everything "because that's the way he deals with his relationship arguments."

19

Most importantly, any unpresented evidence would not alter the import of Mejias's affirmative statements to her about his willing participation in the robbery, or of the actions he took before, during, and after the robbery that further demonstrated this participation. Whether evaluated under the federal or state standard for prejudice (*Chapman v. California*, *supra*, 386 U.S. at p. 24 [federal]; *People v. Watson*, *supra*, 46 Cal.2d at p. 836 [state]), the court's rulings were no consequence in the determination of the charges against Mejias. His appellate claim is without merit.

### III. *The Court's Denial of Mejias's Motion for a Mistrial*

Finally, Mejias argues that the court erred in denying his motion for a mistrial based on prosecutorial misconduct in rebuttal argument that deprived him of due process and a fair trial, requiring reversal. This argument also lacks merit.

### A. *The Proceedings Below*

In her initial closing argument, the prosecutor contended that Mejias's testimony was neither credible nor corroborated by other evidence, unlike the testimony of some other witnesses. Defense counsel in his closing argument contended that much of Mejias's testimony was corroborated by other evidence. He acknowledged that Mejias filled in some "blanks" that were not corroborated, but contended that this meant only that the prosecution did not have that evidence.

In her rebuttal, the prosecutor again addressed this corroboration issue. She contended that defense counsel was asking the jury to look at each piece of evidence individually, rather than together as a whole. She continued with a line of argument that led to the defense objection at issue here:

"There were a lot of what-ifs. Perhaps. Maybe. That's not reasonable doubt. It was an excellent attempt at diversion from what the actual evidence is.

"Notice the jail calls, the content of the jail calls, not discussed [by defense counsel]. Aiding and abetting? Not until the very end. Right? What if what Mr. Mejias said is true? I submit . . . it is not. Had defense had any evidence to corroborate anything that Mr. Mejias said, wouldn't they have brought it forward?

20

"[Defense Counsel]: Objection, Your Honor, misstates the law and the jury instructions.

"The Court: It's argument. Overruled.

"[The Prosecutor]: There's nothing. Nothing to corroborate what Mr. Mejias said. And he testified knowing what the evidence was against him. He couldn't flatly deny it. That wouldn't make sense. Look at how he did testify. He threaded the needle.

"I stand by the argument that there is nothing to corroborate his statements when you look at everything together; when you look at his bias, his motive, and his intent to lie."

The prosecutor then reviewed the incriminating evidence against Mejias, including testimony from Alfaro, Velasquez, and the recorded telephone conversations with Barboza. She concluded this segment of her argument by saying, "You can't ignore the evidence when you go back in that jury room. It all has to go together. All of the acts, all of the statements, all of the evidence provides context and the filter with which you need to view the evidence."

The next day, defense counsel moved for a mistrial because, he contended, the prosecutor's comments that the defense failed to present evidence to corroborate Mejias's testimony were "inappropriate," although "not an egregious violation." The prosecutor responded that she had not engaged in any burden shifting and was entitled to comment on the failure of the defense to present evidence to support their contentions. The court denied the motion because the prosecutor "was commenting on the failure to produce corroborating evidence. . . . [S]he didn't argue, nor did she make any attempt to shift the burden of proof. I think it is fair game within the case law to comment on a failure . . . to prove certain elements of any given charge. That is certainly within her purview to argue the same. So I don't see that . . . as a basis for me to grant a motion for mistrial."

**B. *Analysis***

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial

21

fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)  Also, " ' "when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 283-284.)

Generally, " ' " 'a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819.)  Also, although a defendant may "single[] out words and phrases, or at most a few sentences, to demonstrate misconduct, we must view the statements in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

On appeal, Mejias argues for the first time[7] that the trial court "erred because the only possible witnesses who could have corroborated [Mejias's] testimony regarding his role or lack of role in the robbery and homicide were his three codefendants, *all of whom had a privilege not to be called as a witness* . . . It was improper for the prosecutor to call into question the veracity of [Mejias's] testimony based on his failure to corroborate it with evidence that was beyond his ability to produce."

Mejias's argument is unpersuasive because it is based on the false premise that the prosecutor in effect commented on his failure to call witnesses who were, unbeknownst to the jury, unavailable to testify.  This is incorrect.  The prosecutor asserted in general terms that Mejias had not corroborated any of his testimony with other evidence.  She said nothing about the failure of the other participants in the incident to testify, nor is there any indication that she intended to do so.

---

[7]  Again, Mejias arguably has forfeited his appellate argument by failing to first raise it in the court below.  The People do not raise forfeiture, however, so we address the merits of Mejias's argument.

We also disagree with Mejias's contention that no other evidence could have corroborated his testimony. His own trial counsel asserted that some of his testimony *was* corroborated by other evidence. As for the testimony that he conceded was not corroborated, we can readily think of evidence other than the testimony of the other participants that, theoretically, Mejias might have presented, if it were available. This includes recorded telephone conversations with Barboza, letters he wrote, testimony by Barboza or friends of Mejias, or documentation indicating in one way or another that he participated in large cash transactions.

Given Mejias's false premise, he cannot and does not establish that the prosecutor's comments were misconduct, whether evaluated under the federal or state standard.

Further, even if the prosecutor's comments were misconduct, they were not prejudicial. As with the other matters raised by Mejias in this appeal, the prosecutor's comments did not alter the import of Mejias's affirmative statements to Barboza about his willing participation in the robbery, or of the actions he took before, during, and after the robbery that further demonstrated this participation. Whether evaluated under the federal or state standard for prejudice (*Chapman v. California*, *supra*, 386 U.S. at p. 24 [federal]; *People v. Watson*, *supra*, 46 Cal.2d at p. 836 [state]), the comments were of no consequence in the determination of the charges against him. Mejias's argument, therefore, is without merit.

In light of our conclusions herein, we do not address the other arguments made by the parties.

## DISPOSITION

Regarding Juan Ramon Lopez-Castillo, our independent review having revealed no arguable issues that require further briefing, the judgment is affirmed.

Regarding Jose Carraballo-Mejias, the judgment is affirmed.

23

 

_____

Brick, J.*

We concur:

_____

Kline, P.J.

_____

Richman, J.

 

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24